1  CITY OF FRESNO
   Tina Griffin, Deputy City Attorney (#210328)
2  2600 Fresno Street
   Fresno, CA.  93721-3602
3  Telephone: (559) 621-7500
   Facsimile: (559) 488-1084
4
   BETTS & RUBIN, A Professional Corporation
5  Attorneys at Law
   907 Santa Fe Avenue, Ste. 201
6  Fresno, California 93721
   Telephone: (559) 438-8500
7  Facsimile:  (559) 438-6959
8  James B. Betts (State Bar #110222)
   Joseph D. Rubin (State Bar #149920)
9
   Attorneys for Defendant CITY OF FRESNO,
10
11                 UNITED STATES DISTRICT COURT
12                 EASTERN DISTRICT OF CALIFORNIA
13
14  MICHELLE MAHER,                  )    Case No. 1:08-CV-00050- OWW
15              Plaintiff,           )    DEFENDANT CITY OF FRESNO'S
                                     )    POINTS AND AUTHORITIES IN
16      v.                           )    SUPPORT OF RENEWED MOTION
                                     )    FOR JUDGMENT AS A MATTER
17  CITY OF FRESNO                   )    OF LAW
                                     )
18              Defendant.           )
    _____    )    Date:       March 8, 2010
19                                        Time:       10:00 a.m.
                                          Courtroom:  3
20
21
22
23
24
25
26
27
28

1    I.    PRELIMINARY STATEMENT

2         At the close of evidence, Defendant City of Fresno sought a motion for

3    judgment as a matter of law pursuant to Federal Rules of Civil Procedure, Rule 50.

4    The Court denied the motion and the matter proceeded to verdict.  The jury found

5    against the City on Plaintiff's causes of action for hostile work environment and

6    gender discrimination under the California Fair Employment and Housing Act

7    ("FEHA"), and in favor of the City on the Title IX claims.

8         While the City does not condone bigotry and hatred, the laws at issue are

9    anti-discrimination statutes, not canons of individual virtue or codes of civility.

10   While there was evidence that Plaintiff disagreed with the actions taken by the

11   City, there was insufficient evidence that the City's actions violated FEHA.  As

12   such, the Court should now grant the City's renewed motion under Rule 50.

13

14   II.    ARGUMENT

15         A.    Standards Governing A Motion For Judgment As A Matter of Law

16         "[A]s long as there is no legally sufficient evidentiary basis for a reasonable

17   jury to find for the non-moving party," the Court may grant a motion for judgment

18   as a matter of law after the jury has returned its verdict.  Rule 50(b) of the Federal

19   Rules of Civil Procedure;  Chaney v. City of Orlando, 483 F.3d 1221, 1227 (11th

20   Cir. 2007).  Regardless of whether the district court's analysis is undertaken

21   before or after submitting the case to the jury, "[t]he question before the district

22   court regarding a motion for judgment as a matter of law remains whether the

23   evidence is legally sufficient to find for the party on that issue." Id.  Specifically,

24   judgment as a matter of law should not be granted unless:

25         (1) there is such a complete absence of evidence supporting the
           verdict such that the jury's findings could only have been the result of
26         sheer surmise and conjecture, or (2) there is such an overwhelming
           amount of evidence in favor of the movant that reasonable and fair-
27         minded [persons] could not arrive at a verdict against [him].
     ////
28

1   Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2nd Cir. 2001).

2      When considering a motion to set aside a jury verdict, the court "should
3   review all of the evidence in the record" and "must draw all reasonable inferences
4   in favor of the nonmoving party."  Reeves v. Sanderson Plumbing Prods., Inc. 530
5   U.S. 133, 150 (2000).  While the court must afford due deference to the jury's
6   findings, it is axiomatic that such findings are not automatically insulated from
7   review by virtue of the jury's careful and conscientious deliberation.  Johnson v.
8   Clark, 484 F.Supp.2d 1242, 1245-46 (M.D. Fla. 2007).  Because a Rule 50(b)
9   motion can be renewed after the jury has returned a verdict, the jury's particular
10  findings are not germane to the legal analysis.  Chaney, supra, 483 F.3d at 1228.
11  Rule 50 allows the trial court to remove issues from the jury's consideration "when
12  the facts are sufficiently clear that the law requires a particular result."  Id.

13     "[W]hen reviewing a motion for judgment as a matter of law, the court must
14  apply the law as it should be, rather than the law as it was read to the jury, even
15  if the party did not object to the jury instructions."  Fisher v. City of San Jose,
16  558 F.3d 1069, 1074 (9th Cir. 2009); Pincay v. Andrews, 238 F.3d 1106, 1109
17  (9th Cir. 2001).  A Rule 50 motion can be granted on certain issues or claims and
18  denied on others.  See Bangert Bros. Const. Co., Inc. v. Kiewit Western Co., 310
19  F.3d 1278, 1286 (10th Cir. 2002).

21     **B.   Motion Should Be Granted As To Plaintiff's Claim For Hostile Work Environment**

22     To establish that she was subjected to a hostile work environment, Plaintiff
23  must prove:

24         1.   That Plaintiff was an employee of the City;
25         2.   That Plaintiff was subjected to unwanted harassing conduct
26              because she was female;
27         3.   That the harassing conduct was severe or pervasive;

- 3 -

1            4.     That a reasonable woman in Plaintiff's circumstances would

2                    have considered the work environment to be hostile or abusive;

3            5.     That Plaintiff considered the work environment to be hostile or

4                    abusive;

5            6.     That Plaintiff's supervisors knew or should have known of the

6                    conduct and failed to take immediate and appropriate corrective

7                    action;

8            7.     That Plaintiff was harmed; and

9            8.     That the conduct was a substantial factor in causing Plaintiff's

10                   harm.

11

12 CACI Jury Instruction No. VF 2500; see also, Fuller v. City of Oakland, 47 F.3d

13 1522, 1527 (9th Cir. 1995).[1]

14      Thus, this claim has objective and subjective elements: the misconduct

15 shown must be severe or pervasive enough to create an objectively hostile or

16 abusive work environment, and the victim must also subjectively perceive that

17 environment to be abusive.  Of course, the conduct creating the hostile work

18 environment must have been motivated by the protected characteristic, (e.g.,

19 gender).  In other words, "an environment which is equally harsh for both men and

20 women does not constitute a hostile working environment under the civil rights

21 statutes."  See Brennan v. Metro Opera Ass'n, 192 F.3d 310, 318 (2d. 1999).

22

23

24     [1]  Because Title VII provides similar protections, Title VII cases may be considered in interpreting FEHA.  Beyda v. City of Los Angeles, 65 Cal.App.4th 511, 517 (1998).  However, there are important distinctions between FEHA and Title VII in this area. In FEHA, the terms

25 "discriminate" and "harass" appear in separate provisions and define distinct wrongs.  Because FEHA treats harassment in a separate provision, there is no reason to construe the FEHA's

26 prohibition against discrimination broadly to include harassment.  In contrast, Title VII has no express provision addressing workplace harassment, but courts have construed Title VII's

27 prohibition against discrimination to include harassment that is sufficiently severe or pervasive to alter the conditions of employment.  Roby v. McKesson Corp., 2009 Cal.LEXIS 12374 (Cal.

28 Supreme Court, 11/30/09).

1  The Supreme Court has "made it clear that the conduct must be extreme to

2  amount to a change in the terms and conditions of employment" and that courts

3  must filter out complaints attacking "the ordinary tribulations of the workplace."

4  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

5

6  1.    Conduct Was Not Sufficiently Severe or Pervasive

7  To determine whether conduct is sufficiently severe or pervasive to

8  constitute a hostile work environment, the court looks at all the circumstances,

9  including the frequency of the conduct, its severity, whether it is physically

10  threatening or humiliating, or a mere offensive utterance, and whether it

11  unreasonably interferes with an employee's work performance.  Harris v. Forklift

12  Systems, 510 U.S. 17, 23 (1993).  "The plaintiff must prove that the defendant's

13  conduct would have interfered with a reasonable employee's work performance

14  and would have seriously affected the psychological well-being of a reasonable

15  employee and that she was actually offended."  Fisher v. San Pedro Peninsula

16  Hospital, 214 Cal.App.3d 590, 609-610.[2]  Properly applied, these standards will

17  filter out complaints based on ordinary tribulations, occasional teasing, and

18  utterances that engender offensive feelings.  Faragher v. City of Boca Raton, 524

19  U.S. 775, 788 (1998); Etter v. Veriflo Corp., 67 Cal.App.4th 457, 463 (1998);

20  Ricks v. Conde Nast Publ'g, Inc., 92 F.Supp.2d 338, 345 (S.D.N.Y. 2000)

21  [conduct that is "merely offensive, unprofessional or childish is not discriminatory

22  conduct proscribed by Title VII"]; Curtis v. Airborne Freight Co., 87 F.Supp.2d

23  234,

24

25  _____

26  [2]  In determining the totality of the circumstances, conduct involving or directed at others is
considered less offensive that conduct directed at Plaintiff.  Lyle v. Warner Brothers Television
Productions, 38 Cal.4th 264, 284-5 (2006).  Moreover, harassment directed toward others of

27  which Plaintiff was unaware when it occurred has no bearing on whether Plaintiff reasonably
considered his working environment to be abusive.  Beyda v. City of Los Angeles, 65 Cal.App.4th

28  511, 517-18 (1998); Brooks v. City of San Mateo, 229 F.3d 917, 924 (9th Cir. 2000).

1    250 (S.D.N.Y. 2000) [Title VII does not "protect plaintiffs from undiscriminating
2    intimidation by bullish and abusive supervisors"].

3         FEHA is not a general civility code.  <u>Lyle v. Warner Brothers Television</u>
4    <u>Productions</u>, 38 Cal.4th 264, 295 (2006).  An employee "cannot recover for
5    harassment that is occasional, isolated, sporadic, or trivial; rather, the employee
6    must show a concerted pattern of harassment of a repeated, routine, or a
7    generalized nature." <u>Id</u>. at p. 283; <u>Howley v. Town of Stratford</u>, 217 F.3d 141,
8    153 (2nd Cir. 2000). To be actionable, the working environment must be both
9    objectively and subjectively offensive.  See <u>Fisher</u>, <u>supra</u>, 214 Cal.App.3d at 608
10   [harassment complained of must be "sufficiently pervasive so as to alter the
11   conditions of employment and create an abusive working environment"].

12        Plaintiff's evidence did not come close to satisfying a hostile work
13   environment which is permeated with "intimidation, ridicule and insult … that is
14   sufficiently severe and pervasive to alter the condition of the plaintiff's
15   employment." <u>Birschstein v. New United Motor Manufacturing, Inc.</u> 92
16   Cal.App.4th 994, 1000 (2001).  See <u>Weiss v. Coca-Cola Bottling Co. of Chicago</u>,
17   990 F.2d 333, 337 (7th Cir. 1993) [supervisor kept asking plaintiff about her
18   personal life, called her a dumb blonde, placed hand on her shoulder at least six
19   times, asked her out, placed "I love you" signs in her work area and tried to kiss
20   her once in a bar and twice at work held insufficient on summary judgment].

21        This is especially true when examining cases, similar to here, where the
22   employment lasted a relatively short period of time.  See <u>Chamberlin v. 101</u>
23   <u>Realty, Inc.</u>, 915 F.2d 777, 783 (1st Cir. 1990) [five sexually motivated advances
24   over a four or five week period held insufficient for hostile work environment];
25   <u>Smith v. America Online, Inc.</u>, 499 F.Supp.2d 1251, 1261 (M.D. Fla. 2007)
26   [actions were not sufficiently severe or pervasive where the plaintiff alleged
27   harassing conduct spanning approximately one month and consisted of: (1)
28   Britton's comment to either Smith or Raychael Harkey at the movies "Damn, you

clean up good;" (2) Britton's comment that he would "like to eat those oranges off [Smith's] body;" (3) Britton's action of pulling Smith close to him by her belt loops at the copy machine; (4) Britton's attempt to hug and kiss Smith in the Ruby Tuesday parking lot; and (5) Britton's comment to Smith "I like your new position."]; Myers v. Todd's Hydroseeding and Landscape, LLC, 368 F.Supp.2d 808, 811 (E.D. MI. 2005) [The following eight occurrences in six months failed to establish a hostile working environment: (1) references in plaintiff's presence to "big boobs," "panty lines," and "G-strings" as part of sexual statements or jokes; (2) references in plaintiff's presence to the size of genitals as part of a sexual joke; (3) touching of plaintiff on the shoulders by employee Mike Butler; (4) three comments made by Todd LaButte: "you have aged well", "you are very pretty", and "you have a nice figure"; (5) Todd LaButte's directions to Plaintiff to call him from her home; (6) massaging the shoulders of another female employee in Plaintiff's sight; (7) Todd LaButte's asking another employee to come to his house when his girlfriend was away; and (8) Todd LaButte asked plaintiff to have sexual relations with him.]; compare with Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1247-49 (11th Cir. 2004) [employee of fast food restaurant presented enough evidence for a jury to conclude that the following conduct of her male supervisor over a two to three week period was objectively severe or pervasive: (1) multiple direct and indirect proposals for sex; (2) repeated attempts to touch her breasts, place his hands down her pants or pull off her pants; (3) following her into the bathroom; and (4) enlisting help from others while he attempted to grope her]; Johnson v. Booker T, Washington Broadcasting Serv., Inc., 234 F.3d 501, 506-7, 509 (11th Cir. 2000) [radio co-host who also served as plaintiff's supervisor engaged in conduct that was sufficiently severe or pervasive to fall within objective sexual harassment when in a four month period he, among other things, repeatedly told plaintiff she has a sexy voice, called out plaintiff's name and pulled his pants up in an obscene manner so plaintiff could see the imprint of his private

parts, repeatedly attempted to massage plaintiff's shoulders against her wishes, stuck his tongue out in an obscene manner, rubbed his "body parts" against plaintiff and commented about sex to plaintiff and asked her about her sex life]; Holtz v. Rockefeller & Co., 258 F.3d 62, 70, 75-76 (2d Cir. 2001) [finding a triable issue where a supervisor touched plaintiff in an unwelcome manner on a "daily basis," made "obscene leers at her," "tried to peer down her blouse and up her skirt," and made "approximately ten or twenty" remarks about her sex life]; Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 601-03, 608 (2d Cir. 2006) [reversing district court's grant of summary judgment and holding a reasonable jury could conclude that vice president of company's actions toward employee over a five month period of repeatedly telling her that if she wanted a raise she was "sleeping with the wrong employee," at an office party in the presence of other employees placing his hand on employee's upper thigh and taking a picture of himself doing it, asking if the employee would go with him to his hotel room after the party, and, on several occasions, approaching plaintiff from the back while she was working and placing his hands on her back, neck and shoulders, was objectively severe or pervasive].

   As compared to the above cases, in the instant case there was a complete dearth of evidence admitted at trial to establish that the alleged harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment. Rather Plaintiff's harassment case was almost exclusively predicated upon a rumor that Plaintiff had dated other recruits while she was in the academy.[3]  At trial, Plaintiff  did not present any evidence (other than state of mind evidence) that she

---

[3] Although there was evidence at trial that Peter Flores asked Plaintiff out on a date at a mud volleyball game, Plaintiff denied that testimony, and the alleged event occurred prior to Plaintiff's employment with the City. To the extent that there was a rumor about Specialist Flores asking Plaintiff out on a date before she was employed by the City, it was Plaintiff who instigated that rumor. [RJN, Ex. L, Wong 1352:11-19; Ex. N, Stowe 1925:12 - 1926:7; Ex. N, Wedemeyer 1899:2 - 1901:1; Ex. K, Flores 1171:20-1172:24; Ex. I, McPeters 835:2 - 14; Ex. G, Cabral 373:9-19; Ex. L, Woodard 1501:11 - 1502:13.]

1  was a direct recipient of the asserted rumor. [RJN, Ex. J, Maher 1014:1-25.]

2  Moreover, there was no evidence of any rumor that Plaintiff had done anything

3  other than allegedly "dating" these individuals (i.e., there was no evidence that the

4  rumor was of a sexual or vulgar nature.) [RJN, Ex. K, Woodard 1256:12 - 1257:9;

5  Ex. J, Maher 1014: 1-25.]   Furthermore, the evidence, was that this rumor was

6  related to Plaintiff dating fellow male recruits. [RJN, Ex. K, Woodard 1256:12 -

7  1257:9; Ex. J, Maher 1014: 1-25.] In fact, the only person who testified at trial

8  regarding personal knowledge of a rumor about Plaintiff dating others was

9  Firefighter Woodard Jr., who testified that on one occasion while he was in the

10  rookie room at the drill school, he heard a rumor that Plaintiff was dating other

11  recruits.  He did not recall Plaintiff being there at the time the comment waw

12  made, and he said that when he later spoke to Plaintiff about the rumor, she

13  laughed. [RJN, Ex. K,  Woodard 1256:12 - 1257:9]

14         Besides Firefighter Woodard, no other person testified regarding personal

15  knowledge of a rumor of Plaintiff dating others.  Consequently, the only evidence

16  offered at trial by anyone other than Firefighter Woodard was first and second

17  level hearsay. [RJN, Ex. L, Wong 1352: 11-19; Ex. N, Stowe 1925:12-1926:7;

18  Ex. N, Wedemeyer 1899:2-1901:1; Ex. K, Flores 1171:20-1172:24; Ex. I,

19  McPeters 835:2-14; Ex. G, Cabral 373:9-19.] Thus, there is no evidence that there

20  were in fact any other rumors about Plaintiff other than that testified to by

21  Firefighter Woodard.

22         Although rumors in which gender is a substantial factor may create a hostile

23  work environment, rumors which are gender neutral do not establish actionable

24  sexual harassment.  Accardi v Superior Court (1993) 17 Cal.Ap.4th 341, 346-349

25  (disproved on other grounds in Richards v CH2M Hill, Inc. (2001) 26 Cal.4th 798,

26  823-824) [Plaintiff's allegations of untrue rumors that she had slept with superior

27  officers did not establish sexual harassment as the rumors were gender neutral

28  and Plaintiff did not establish that she would not have been treated in the same

1   manner if she were a man.] See also Pasque v Metropolitan Life Ins. Co. (7th Cir.

2   1996) 101 F.3d 514, 517 [no evidence that rumors of relationship between

3   plaintiff and female coworker were spread because plaintiff was a male] Snoke v

4   Staff Leasing, Inc. (M.D. Fla. 1998) 43 F. Supp.2d 1317, 1326-1327 [rumors that

5   female plaintiff was having an affair with a male manager did not show

6   harassment based on sex because both were the subject of the rumors and both

7   men and women were discussing them]; Huffman v City of Prairie Village, KS

8   (D.Kan. 1997) 980 F.Supp. 1192, 1197-1198 [rumors that female police

9   dispatcher was dating male sergeant not based on sex since rumors were directed

10  at both.]

11          Consequently, the evidence adduced at trial established that the alleged

12  offending conduct was extremely limited in both severity and duration.  It is

13  important to note that the alleged harassing conduct was non-threatening and did

14  not involve any physical contact.  Rather, the conduct which allegedly supported

15  Plaintiff's harassment claim was limited to a single, innocuous, gender neutral

16  rumor regarding certain pre-employment conduct.  In fact, there was no evidence

17  that the complained of conduct was severe, pervasive, attributed to Plaintiff's

18  gender or that such conduct unreasonably altered the terms of Plaintiff's

19  employment.

20          The case law on when verbal abuse gives rise to a hostile work environment

21  claim requires a far greater degree of abuse than the record in this case, both in

22  terms of the frequency and the nature of the offensive communications.  "Mere

23  utterance of an …epithet which engenders offensive feelings in an employee does

24  not sufficiently affect the conditions of employment to implicate Title VII.  Harris,

25  supra, 510 U.S. at 21.  It is only where such conduct becomes so "severe or

26  pervasive" that a FEHA violation may exist.  The verbal exchanges, at most, show

27  clashing personalities and disagreements but no actionable harassment.  "It is a

28  simple fact that in a workplace, some workers will not get along with one another,

1   and this Court will not elevate a few harsh words or 'cold-shouldering' to the level

2   of an actionable offense".    McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d

3   558, 564 (5th Cir. 1998).  Although the conduct may have been boorish, stupid

4   and inconsiderate, it was not severe and pervasive as a matter of law.  See,

5   Casenas v. Fujisawa USA, Inc., 58 Cal.App.4th 101, 115 (1997) ["'An employee

6   may not be unreasonably sensitive to his [or her] working environment …. Every

7   job has its frustrations, challenges, and disappointments; these inhere in the

8   nature of work.'"]

9

10          2.    Reasonable Person Would Not Have Found Environment to be
                  Hostile

11

12          Plaintiff was not able to satisfy the requisite element that a reasonable

13   person would have found the environment to be hostile or abusive.  Even if any

14   comments were offensive, such comments would not be viewed by a reasonable

15   person as hostile.  These offhand comments and isolated incidents did not

16   materially alter Plaintiff's terms of employment.  The comments did not constitute

17   "the steady barrage of opprobrious racial comments", as to be actionable.

18   Elmahdi v. Marriott Hotel Services, Inc., 339 F.3d 645, 653 (8th Cir. 2003).

19          On evidence of harassment that is far greater than that introduced in this

20   proceeding, Courts have set aside jury verdicts.  See, e.g. Mokler v. County of

21   Orange, 157 Cal.App.4th 121, 144-46 (2007) [in reversing trial court's order

22   denying JNOV, the Court held that three sexually insensitive statements, inquiries

23   about marital status and home address, and limited glaring and touching in the

24   course of five weeks was not actionable harassment under FEHA; Gupta v. Florida

25   Bd. of Regents, 212 F.3d 571, 584-6 (11th Cir. 2000) [trial court should have

26   granted judgment as a matter of law to defendant because the following alleged

27   conduct by a male department coordinator at a university (Rhodd) directed toward

28   a female associate professor (Gupta) over a six or seven month period was not

1  sufficiently severe or pervasive from an objective view: (1) flirtatious comments
2  such as "[you are] looking very beautiful"; (2) frequent calls to her house at night
3  asking personal questions such as "are you in bed yet?," "I was wondering how
4  you were doing?," and "are you talking to your boyfriend?"; (3) one incident when
5  Gupta entered Rhodd's office when he was expecting her and she found him
6  partially undressed; (4) one incident where Rhodd placed his hand on Gupta's
7  inner thigh; and (5) one incident where Rhodd lifted Gupta's dress about four
8  inches, felt the hem and said "what kind of material is that?"]; Black v. Zaring
9  Homes, Inc., 104 F.3d 822, 823-24, 826-27 (6th Cir. 1997) [reversing jury verdict
10 where conduct over a four-month period involved repeated sexual jokes; one
11 occasion of looking plaintiff up and down, smiling and stating, "there's nothing I
12 like more in the morning than sticky buns"; suggesting land located near a Hooters
13 Restaurant be named "Titsville" or "Twin Peaks"; asking plaintiff "say, weren't you
14 there [at a biker bar'] Saturday night dancing on the tables?"; stating, "just get the
15 broad to sign it"; telling plaintiff she was "paid great money for a woman"; and
16 laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently
17 pronounced as "bosom"; Baskerville v. Culligan International Co., 50 F.3d 428,
18 430-1 (7th Cir. 1995) [concluding actions not sufficiently severe or pervasive to
19 support a hostile-environment claim where plaintiff alleged nine instances of
20 offensive behavior over
21 seven months including repeated references to plaintiff as a "tilly" and a "pretty
22 girl" and one instance of simulated masturbation].
23        In sum, the law and evidence applicable to Plaintiff's hostile work
24 environment claim support the granting of the City's Rule 50 motion.
25
26        C.    Plaintiff Cannot Prevail on Her Disparate Treatment Claim Under FEHA
27        To prevail upon a claim for disparate treatment under FEHA, Plaintiff was
28 required to prove all of the following:

1

2          1.      That Plaintiff was an employee of the City of Fresno;

3          2.      That City of Fresno caused Plaintiff to resign and/or discharged her;

4          3.      That Plaintiff's gender was a motivating reason for the termination;

5          4.      That Plaintiff was harmed; and

6          5.      That her gender was a substantial factor in causing Plaintiff's harm.

7          The plaintiff has the burden of proving that she suffered an adverse

8   employment action and that plaintiff's gender was a motivating factor for the

9   defendant's adverse action.  Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir.

10  1995).  "While a complainant need not prove that [discriminatory] animus was the

11  sole motivation behind a challenged action, he must prove by a preponderance of

12  the evidence that there was a 'causal connection' between the employee's

13  protected status and the adverse employment decision".  Mixon v. Fair

14  Employment and Housing Commission, 192 Cal.App.3d 1306, 1319 (1987).

15  Moreover, "[W]here the same actor is responsible for both the hiring and the firing

16  of a discrimination plaintiff, and both actions occur within a short period of time, a

17  strong inference arises that there was no discriminatory action."  Coghlan v.

18  American Seafoods Co. LLC, 413 F.3d 1090, 1096 (9th Cir. 2005); West v.

19  Bechtel

20  Corp., 96 Cal.App.4th 966, 981 (2002) [applying the presumption in a FEHA

21  action].

22          Succinctly stated, Plaintiff did not meet her evidentiary burden at trial.

23                  1.      The Evidence Established That Plaintiff Did Not Meet
                            Performance Standards
24

25          The evidence adduced at trial established that each recruit is evaluated by

26  the Three A's — Academics, Aptitude, and Attitude.  With respect to Plaintiff's

    academics, she consistently tested below the 80% standard after the EMT portion
27
    of the academy. [RJN, Ex. I, Cabral 649:18-650:2; JX5]  The evidence showed
28

1   that although the EMT portion of the academy was taught and evaluated during

2   the first four weeks of the academy, the written scores issued by American

3   Ambulance were not included in the recruits' cumulative scores because they

4   would skew the results. [RJN, Ex. I, Mendoza 760:11-761:17.]

5        With respect to her aptitude and attitude, the evidence showed that before

6   her counseling session with Battalion Chief Cabral on November 29, 2005, the

7   training staff noted that Plaintiff exhibited performance and behavioral problems.

8   Specifically, Plaintiff was noted to have issues with not following directions,

9   interpersonal relations, inability to work without constant supervision, and

10  generally having difficulty understanding and performing skills under pressure.

11  [RJN, Ex. M, Cabral 1563:14-1564:8, 1606:25-1607:19; Exs. I and N, McPeters

12  1937:14-20, 1938:7-1939:22, 829:2-14; Ex. M, Griffith 1693:14-1694:6,

13  1696:3-1697:1; Ex. N, Flores 1808:19-1809:20.]  Thus, Plaintiff exhibited

14  problems in all three areas at the same time – Academics, Attitude, and Aptitude.

15       Based on the recommendations from all four drill staff members and his own

16  personal observations, Battalion Chief Cabral brought these issues to the attention

17  of Chief Bruegman, and recommended termination. [RJN, Ex. M, Cabral

18  1563:6-1564:8, 1606:25-1607:19] Chief Bruegman informed BC Cabral that he

19  needed additional documentation to support Plaintiff's termination from the

20  academy. [RJN, Ex. M, Cabral 1564:9-17]  Because the benchmark mid-term was

21  approaching for evaluating the status of a recruit, BC Cabral met with Plaintiff and

22  advised that she had to meet standard at the mid-term in order to continue on in

23  the academy. [RJN, Ex. M, Cabral 1565:22-24, 1567:15-24]  BC Cabral also had

24  a similar conversation with a male recruit, Mariano Caro, who was also performing

25  below standard. [RJN, Ex. M, Cabral 1565:13-1566:1.] The purpose of the

26  mid-term was to put the recruits under stress and see how they perform the skills

27  they would actually experience in the field under the same simulated conditions.

28  [RJN, Ex. G, Bruegman 347:9-348:5]

1    During that pre-mid-term counseling session, BC Cabral advised Plaintiff that

2   if she did not meet standards at the mid-term she would be terminated. [RJN, Ex.

3   M, Cabral 1565:22-24, 1567:15-24]  He informed her that she had to have

4   passing grades on each IPE, and score at least 80% on the written examination,

5   not a cumulative grade of 80%. [RJN, Exs. H and M, Cabral 1567:15-24,

6   651:21-652:6]

7    The mid-term examination took place on December 1 and 2, 2005. Plaintiff

8   did not meet the requisite standards at mid-term.  BC Cabral testified that Plaintiff

9   scored a 77% on her written mid-term test and failed two of the six skill sets

10   tested. [RJN, Ex. I,  Cabral 649:14-17, 655:20-656:5] It should be noted that

11   Recruit Caro also received counseling before the mid-term and was given a similar

12   ultimatum and expectation for mid-term results. [RJN, Ex. I, Cabral 652:7-24]

13   However, unlike Plaintiff, Recruit Caro met those expectations by passing at all

14   levels. [RJN, Exs. H and I, Cabral 655:6-17; 470:17-25]

15    Based on Plaintiff's mid-term results, Chief Bruegman agreed with the

16   recommendation to terminate Plaintiff. [RJN, Ex. M, Cabral 1563:6-1565:12]

17            2.    Only A Single Recruit Was Arguably Similarly Situated to
                   Plaintiff

18
     A plaintiff may attempt to prove a defendant's proffered reasons for adverse
19
    action are pretextual by presenting evidence that the employer treated similarly
20
    situated persons in similar circumstances more favorably than it treated plaintiff.
21
    McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 804.  However, the
22
    compared employees must be similarly situated in all material respects to the
23
    plaintiff.  Vasquez v. County of Los Angeles (9th Cir. 2003) 349 F3d 634, 641;
24
    Marquez v. Bridgestone/Firestone, Inc. (8th Cir. 2004) 353 F3d 1037, 1038
25
    [employee required to point to individuals who have dealt with the same
26
    supervisor, have been subject to the same standards, and engaged in the same
27
    conduct without any mitigating or distinguishing circumstances];  Hollins v.
28

1  Atlantic Co., Inc. (6th Cir. 1999) 188 F.3d 652, 659.

2          To the extent that Plaintiff used comparative evidence regarding the

3  treatment of the other recruits in her evaluations by Fresno Fire drill staff to show

4  pretext, no other recruit was similarly situated as Plaintiff in all material respects.

5  Unlike Plaintiff, there was no other recruit that contemporaneously did not meet

6  standards in the areas of attitude, aptitude, and academics.  Alternatively, the only

7  individual who was arguably similarly situated to Plaintiff before the mid-term was

8  male recruit Mariano Caro.  Although Caro was also issued an ultimatum before

9  the mid-term, he was allowed to continue in the academy because, unlike Plaintiff,

10  he passed the mid-term in all respects. [RJN, Exs. H and I, Cabral 470:17-25,

11  652:7-24, 655:6-17]    A review of the remaining recruits demonstrates that those

12  individuals were not comparable to Plaintiff.

13          a.    Recruit Bindenagle:  The evidence showed that although Bindenagle

14  had issues with his aptitude and attitude, he maintained a cumulative written test

15  score above 80% before mid-term (i.e., 84.7%). [RJN, Ex. I, Mendoza

16  728:4-730:11, 741:17-746:6] Thus, he was not similarly situated to Plaintiff in all

17  material respects.

18          b.    Recruit Morris:    The evidence showed that Morris had a cumulative

19  written test score above 80% before mid-term (i.e., 83.5%), and only had an issue

20  with his stamina.  There was no evidence of any attitude problem. [RJN, Ex. I,

21  Mendoza 735:14-736:15, 752:4-753:15]  Thus, Recruit Morris was also not

22  similarly situated to Plaintiff in all material respects.

23          c.    Recruits Thomas, Townsend, Barnhart, Cross, and Woodard: The

24  evidence showed that before the mid-term, these recruits only had issues with

25  their academics. [RJN, Ex. I, Mendoza 723:12 - 754:21.] There was no evidence

26  that these individuals also had issues with their attitude or their aptitude.

27          d.    Recruit Caro:  The evidence showed that before mid-term, Caro had

28  problems with his stamina, completing his IPEs, and maintaining a cumulative

1  written test score above 80%.  [RJN, Ex. H, Cabral 485:22-486:5; Ex. I,

2  Mendoza 730:12-750:20.]  However, Recruit Caro was also issued counseling

3  before the mid-term by BC Cabral. Thus, even if he were considered similarly

4  situated as Plaintiff, he was issued a counseling session like Plaintiff, and was

5  offered the same means of continuing on in his training, which he satisfied.  [RJN,

6  Exs. H and I, Cabral 652:7-24, 655:6-17; 470:17-25]

7              3.     No Evidence was Presented that Any Recruit Benefitted from
                      the Mistakes on Evaluations

8
9  At trial, Plaintiff introduced evidence that mistakes were made in compiling

   the evaluations of several male recruits.  However, Plaintiff did not present any
10
   evidence that the status of the male recruits in the class improved before the mid-
11
   term because of those mistakes.  That is, there is no evidence that "but-for" the
12
   mistakes made in the evaluations, other male recruits would have been counseled
13
   along with Plaintiff and Caro.
14
15          a.     Recruit Bindenagle:  The evidence showed that Recruit Bindenagle

16  was already having problems with his aptitude (i.e., IPE scores and stamina), and

17  so a change on an IPE score from a Below Standard to a Unsatisfactory on his

18  evaluation did not change his recognized need to improve his performance in

    aptitude. There was no evidence that Recruit Bindenagle's cumulative written test
19
    score (above 80%) before mid-term was not accurate.  Thus, the mistakes had no
20
    impact on his recognized issues with aptitude and attitude.
21
22          b.     Recruit Morris:  The evidence showed that the SCBA IPE 8, evaluation

23  scores should have been Unsatisfactory rather than Below Standard. [RJN, Ex. I,

    Mendoza 735:14-736:15, 752:4-753:15]  However, the evidence also showed
24
    that before mid-term, he received a Standard score on the IPE. [RJN, Ex. N, Flores
25
    1781:9-1782:8, Exhibit 362.1-3(unredacted 369.1-3).] There is no evidence that
26
    Recruit Morris's cumulative written test score (above 80%) before mid-term was
27
    not accurate, or that he had issues with attitude.  Thus, the mistake had no
28

1    impact on his recognized issue with aptitude.

2           c.    Recruit Cross:  The evidence showed that the SCBA IPE 8, evaluation
3    scores should have been Unsatisfactory rather than Below Standard. [RJN, Ex. I,
4    Mendoza 733:12-735:11, 750:21-752:3]   However, like Recruit Morris, the
5    evidence also showed that before mid-term, he received a Standard score on the
6    IPE. [RJN, Ex. N, Flores 1777:11-1778:1, 1780:2-1781:6, Exhibit 361.1-3
7    (unredacted 370.1-3).]  There is no evidence that Recruit Morris's cumulative
8    written test score was increased to above the 80% standard by any mistake, or
9    that he had issues with attitude.  Thus, the mistake had no impact on his
10   recognized issue with aptitude.

11          d.    Recruit Woodard:   The evidence showed that on the SCBA IPE 8 and
12   35'Ladder IPE 5, Woodard should have received a Below Standard score instead of
13   Standard. [RJN, Ex. I, Mendoza 739:25-740:25, 753:16-754:21]  However, the
14   evidence also showed that the Below Standard scores were overall "Pass" grades
15   (i.e., he received a Below Standard but Pass).  [RJN, Ex. I, Mendoza
16   753:18-754:14, Exhibits 135.32-34, 135.35-37]  There was also testimony that
17   when a recruit got a below standard but an overall pass score on an IPE, it meant
18   that an individual was able to exhibit they could complete the task but may have
19   exceeded the time limit or made non-critical errors.  [RJN, Ex. H, Cabral
20   601:9-602:15; Ex. I, Mendoza 707:3-8]  Thus, the mistakes did not change
21   Recruit Woodard's issues with academics and whether he could perform his
22   manipulative tasks.  There was also no evidence that he had any issue with his
23   attitude.

24          e.    Recruit Caro:  The evidence showed that Recruit Caro should have
25   received Unsatisfactory rather than Below Standard on IPE 7 (24" Ladder
26   Extension) and IPE 6 (Aerial Ladder).  [RJN, Ex. I, Mendoza 730:12-733:11,
27   746:7-749:4, 749:20-750:20]  However, the evidence also showed that Recruit
28   Caro was already having performance issues in aptitude. [RJN, Ex. H, Cabral

1   485:22-486:5]  For these reasons, he was required to attend a counseling session

2   with BC Cabral, as was Plaintiff. [RJN, Exs. H and I, Cabral 652:7-24, 655:6-17;

3   470:17-25] Thus, the mistakes did not change the fact that Recruit Caro had

4   issues with his aptitude, academics, and to some extent attitude (i.e.,

5   decision-making skills). Recruit Caro was only allowed to continue in the academy

6   when he passed the mid-term.  He was ultimately terminated from the academy

7   shortly thereafter for safety reasons. [RJN, Ex. H, Cabral 494:15-25]

8        Moreover, the evidence showed that the transfer of Plaintiff's IPEs scores to

9   the evaluation form were accurate.  [RJN, Ex. I, Mendoza 755:7-12]  There is no

10  evidence that Plaintiff was inaccurately marked down on any IPE scores she

11  received.  Thus, Plaintiff was not prejudiced by, and no male recruits substantially

12  benefitted from, any of the referenced mistakes.

13       Accordingly, Plaintiff has not met her burden of producing evidence to

14  demonstrate by a preponderance of the evidence that Defendants' legitimate

15  nondiscriminatory reasons for making the decision to terminate her were a pretext

16  for gender discrimination.  There was only a single recruit who was arguably

17  similarly situated to Plaintiff, and that recruit passed the mid-term exam.  Thus,

18  Plaintiff failed in her bid to prove a disparate treatment case.

19  III.   CONCLUSION

20       Based on the foregoing, the City of Fresno requests that the Court grant its

21  motion for a judgment as a matter of law on Plaintiff's FEHA claims for hostile

22  work environment and gender discrimination.

23  Dated: December 15, 2009          BETTS & RUBIN

24                                    By /s/ James B. Betts
                                      James B. Betts
25                                    Attorneys for Defendant
                                      CITY OF FRESNO
26

27

28

1

<u>PROOF OF SERVICE</u>

2    I am a citizen of the United States of America, a resident of Fresno
County, California, over the age of 18 years and not a party to the within-entitled
3    cause or matter.  My business address is 907 Santa Fe Avenue, Ste. 201, Fresno,
CA. 93721.  On December 15, 2009, I served DEFENDANT CITY OF FRESNO'S
4    POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW on the parties in this action by placing an original/a true
5    copy in an envelope and delivering it as follows:

6    _____(By Overnight Courier) I caused such envelope with postage fully prepaid, to
be sent by _____.

7

8    _X__  (By Mail) I placed the envelope for collection and processing for mailing
following this business' ordinary practice with which I am readily familiar.
9    On the same day correspondence is placed for collection and mailing, it is
deposited in the ordinary course of business with the United States Postal
Service with postage fully prepaid.

10

11    _____(By Hand)I caused each envelope to be delivered by hand.

12    Each envelope was addressed as follows:

13    Debra A. Smith, Esq.                    Dan Siegel, Esq.
Noreen Farrell, Esq.                    Jessica Albert, Esq.
14    Angela Perone, Esq.                     Siegel & Yee
Equal Rights Advocates                  499 14th Street, Suite 220
15    1663 Mission Street, Suite 250          Oakland, CA. 94612
San Francisco, CA. 94103

16

17    James C. Sanchez, Esq.
Tina Griffin, Esq.
18    CITY OF FRESNO
2600 Fresno Street
19    Fresno, CA. 93721-3602

20

21    ___    (By Telecopy) I caused each document to be sent by telecopier to the
aforementioned number(s).

22    I declare under penalty of perjury under the laws of the State of California
that the above is true and correct.  Executed on December 15,  2009, at Fresno,
23    California.

24

25                                        /s/ Ellen Carnese_____
Ellen Carnese

26

27

28

- 20 -